1  Devin A. McRae, State Bar Number 223239
    *dmcrae@earlysullivan.com*
2  Jeremy J. F. Gray, State Bar Number 150075
    *jgray@earlysullivan.com*
3  Ryan M. Hemar, State Bar Number 305355
    *rhemar@earlysullivan.com*
4  EARLY SULLIVAN WRIGHT
    GIZER & McRAE LLP
5  6420 Wilshire Boulevard, 17th Floor
   Los Angeles, California 90048
6  Telephone: (323) 301-4660
   Facsimile: (323) 301-4676
7
   Attorneys for Plaintiff
8  KURT MCLEOD

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| KURT MCLEOD, an individual, | Case No. |
|---|---|
| Plaintiff, | **COMPLAINT FOR:** |
| v. | 1. **BREACH OF ORAL CONTRACT;** |
| ZERO GRAVITY MANAGEMENT, an unknown business entity; MARK WILLIAMS, an individual; ERIC WILLIAMS, an individual; and DOES 1-50, inclusive, | 2. **BREACH OF FIDUCIARY DUTY** |
| | 3. **FRAUD AND CONCEALMENT;** |
| | 4. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; AND** |
| Defendants. | 5. **QUANTUM MERUIT** |
| | **DEMAND FOR JURY TRIAL** |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

665963.1

Plaintiff Kurt McLeod ("Plaintiff" or "Mr. McLeod") brings this diversity action against Defendants Zero Gravity Management ("ZGM"), Mark Williams ("Mark"), Eric Williams ("Eric," jointly with Mark, the "Williams brothers") and DOES 1-50, inclusive (collectively, "Defendants"), and in support thereof, alleges as follows:

## INTRODUCTION

1. In 2011, Plaintiff was a fledgling, but extremely talented screenwriter. One of his unproduced scripts caught the eyes of Eric and Mark, who are brothers and partners in ZGM. ZGM, Eric and Mark work in the entertainment industry as managers of artists. They also serve as producers of content including films and television. Eric contacted Mr. McLeod, offered to have ZGM become his manager, and the parties entered into a management agreement on March 25, 2011. By agreeing to become Mr. McLeod's managers, ZGM, Eric and Mark agreed to act with the utmost good faith and to always serve Mr. McLeod's best interests; in short, they became his fiduciaries. Sadly, as alleged below, ZGM, Eric and Mark violated their obligations to Mr. McLeod in the production of the motion picture *Copshop* causing him damages well in excess of $1 million.

2. After agreeing to serve as Mr. McLeod's manager, the parties then communicated about some ideas suggested by ZGM for Mr. McLeod's next original screenplay. One of the ideas concerned a "cat and mouse" game between two antagonists intentionally jailed overnight in a police station. Mr. McLeod turned that germ of an idea into a full-fledged screenplay then titled *Police Station*. This screenplay was ultimately produced as the recently released motion picture *Copshop*. (Throughout this Complaint the terms screenplay and script refer to this work, regardless of its title or stage of production.)

3. After Mr. McLeod completed the screenplay and received an overwhelmingly positive response from ZGM, he was introduced to Mark for the first time. Before the production and release of *Copshop*, and as often happens in

the movie business, ZGM and Mr. McLeod engaged for several years with a variety of third-party producers and directors in what were ultimately unsuccessful efforts to create a motion picture based on the screenplay. During that time, Mr. McLeod became concerned about Mark's efforts to claim some form of "credit" as an author of the screenplay.[1] Mr. McLeod voiced some issue with this behavior but ultimately relied on the fact that his managers were acting in his best interests and their representations to him that Mark's involvement in this way was required for the successful production of a movie.

4. It was only after the production of *Copshop* that it became clear to Mr. McLeod that Mark's efforts to claim credit for the script was only one small example of the misconduct by ZGM, Eric and Mark created by their conflict of interest in simultaneously serving as Mr. McLeod's manager and as a producer.

5. In about 2016, ZGM introduced Mr. McLeod to a company called Sculptor Media LLC ("Sculptor") which Mr. McLeod understands would ultimately become the production company responsible for *Copshop.* ZGM and its representatives received producing credit for *Copshop* primarily due to their connection to the screenplay via their client Mr. McLeod. And, during the ensuing development and production process for *Copshop*, ZGM, Eric and Mark undertook to maximize their participation as producers on the film when they should have devoted their attention to serving the interests of their client, Mr. McLeod. As such, they violated their duties to Mr. McLeod by acting for themselves and against his interest, by, among other things, concealing material information from him and by concealing and misrepresenting the anticipated budget for the film to him.

---

[1] This is not the first time Mark has been sued for gobbling up credit for things he did not write. The screenwriter, Nick May, sued Mark in 2021 for claiming credit on another law enforcement thriller, *Blacklight*. (*May v. Williams et al* (Case No. 21STCV09990).) Mark quickly settled this lawsuit and gave Mr. May the proper credits on the film. Mark has a pattern of taking credit where credit is ***not*** due.

6. One of the most egregious acts of misconduct by ZGM and the Williams brothers was their negotiation of screenwriting fee for Mr. McLeod which they knew should have been larger by a factor of ten (10x) but which they nonetheless advised him to take. In fact, they did this twice. ZGM advised Mr. McLeod to agree to a cap on his screenwriting fee even though they knew – and concealed from Mr. McLeod – that the budget for the film was much larger than anticipated and that this cap would mean that he would only earn a fraction of what he should. Specifically, in March 2020, Mr. McLeod's managers negotiated an option agreement with Sculptor on behalf of Mr. McLeod. This option agreement, which ZGM advised Mr. McLeod to sign, directly linked Mr. McLeod's potential screenwriting fee to the budget of any produced movie, *i.e.*, he would be paid two and one-half percent (2.5%) of the budget. However, the agreement with Sculptor capped Mr. McLeod's fee at $125,000.00. Six months later, and just days before production of *Copshop* was about to start, ZGM again negotiated the identical capped fee for Mr. McLeod, which was a fraction of what he should have earned on the movie if he were to be paid 2.5% of the budget.

7. ZGM, Eric and Mark concealed the true budget for *Copshop* from Mr. McLeod (and convinced him the cap on his fee was reasonable) to serve their own interests and in contravention of their obligations to their client. Specifically, by reducing the amount of money to be paid to Mr. McLeod (for which as **managers** they would only be paid a fifteen-percent commission) they increased the amount of money they earned directly and fully as **producers** on *Copshop*.

8. In addition, ZGM and the Williams brothers ultimately succeeded in getting Mark a "Story By" credit which served their interests, but which has had negative effects on Mr. McLeod's own credit on the film, his residuals, profit participation and other longer-term harms.

9. This Complaint seeks to undue the harm visited upon Mr. McLeod by virtue of the misconduct of ZGM, Eric and Mark.

## PARTIES

10. Plaintiff is, and was at all times relevant to this Complaint, a individual working as a screenwriter who resides in Alberta, Canada.

11. ZGM is an unknown business entity with its principal place of business in Los Angeles, California. ZGM manages artists working in the film and television business as well as operating as a producer. (The use of ZGM in this Complaint refers not just to ZGM but to ZGM, Eric and Mark and each of them.)

12. Mark is, and was at all times relevant to this Complaint, an owner and/or partner of or in ZGM working as a manager and producer who, on information and belief resides in the Los Angeles area (and the certainly the State of California).

13. Eric is, and was at all times relevant to this Complaint, an owner and/or partner of or in ZGM working as a manager and producer who on information and belief resides in the Los Angeles area (and certainly the State of California).

14. Does 1-50 are individuals or entities which either directly, indirectly, or in concert with other defendants possess responsibility and/or liability under the claims alleged herein but are currently unknown to Plaintiff. Such individuals and/or entities will be added to this action when, and if it becomes appropriate to do so.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this matter because the parties are diverse under 28 U.S.C. § 1332 and the amount in controversy exceeds $75,000.00.

16. Venue is proper in this District under 28 U.S.C. 1391 because, among other things, at least one defendant resides in this District and because a substantial part of the acts and omissions giving rise to this action occurred in this District.

## GENERAL ALLEGATIONS

### Background

17. Mr. McLeod is a screenwriter.

18. Defendants ZGM, Eric and Mark manage screenwriters and other artists as well as producing film and television. These twin roles of manager and producer create conflicts of interest which were ignored by Defendants, and which caused considerable harm to Mr. McLeod.

19. In or about February 2011, Eric emailed Mr. McLeod. Eric wrote that he had read a script written by Mr. McLeod titled *Hot and Bothered* and said that it included some "fantastic dialogue." Eric suggested they meet to discuss the possibility of ZGM becoming his "manager." In Hollywood, a manager takes on the responsibility of shepherding an artist's career. An artist relies on his or her manager to provide counsel and advice regarding career options and opportunities that are in the artist's best interest. Managers can and do negotiate on behalf of their clients with producers and others. During such negotiations, managers must serve the best interests of their clients. The relationship between an artist and a manager is a fiduciary relationship.

20. After meeting, the parties then entered into a written "Representation Agreement" effective March 25, 2011. The agreement provided that ZGM and its partners Eric and Mark, would represent Mr. McLeod as his "sole and exclusive managers" in his capacity as a "writer, director and/or producer." This agreement created a fiduciary duty on the part of ZGM, Eric, Mark, and each of them, to act with the utmost good faith and in the best interests of Mr. McLeod. This agreement states that it shall be effective for two years and does not contain any renewal clause. The parties did not renew this agreement.

21. After the Representation Agreement expired on or about March 25, 2013, the parties continued their relationship; ZGM, Eric and Mark continued to act as Mr. McLeod's manager. After March 25, 2013, ZGM, Eric, Mark and Mr.

McLeod were parties to an oral agreement which contained the following terms: ZGM and the Williams brothers agreed to serve as Mr. McLeod's managers (with the accompanying fiduciary obligations) and Mr. McLeod agreed to compensate ZGM in an amount equal to fifteen percent (15%) of his gross compensation from any projects (the "Agreement"). This oral agreement was operative during the events underlying this lawsuit and was breached by ZGM, Eric and Mark.

## The Screenplay For *Copshop*

22. On or about March 25, 2011, Eric emailed Mr. McLeod several "nuggets of ideas" which could possibly serve as the inspiration for Mr. McLeod's screenplay. One of those ideas was for an action/thriller film largely set in a police station where two antagonistic prisoners play a game of "cat and mouse" through the course of a night. Mr. McLeod liked this idea and he and his managers agreed that he would begin work on a screenplay.

23. Mr. McLeod's first step was to prepare outlines/treatments for a potential screenplay which he shared with Eric. Eric offered some thoughts on the treatments, and, in the summer of 2011, Mr. McLeod and Eric agreed that it was time to begin drafting the screenplay itself.

24. Over the next couple of months, Mr. McLeod drafted the screenplay (then titled *Police Station*) and when finished he submitted it to ZGM and Eric. On September 14, 2011, Eric emailed Mr. McLeod that he had read the screenplay and that "[w]e think you hit this out of the park. Great job."

## The Initial Development Process

25. Over the ensuing years, and before the production of the *Copshop* movie, the screenplay generated interest with several agents, directors and producers. Although these development activities did not result in any production of the screenplay, they reveal the origins of the conflict of interest between Mr. McLeod and his managers, ZGM, Eric and Mark.

26. In or about October 2011, Eric emailed Mr. McLeod and advised him

that an agent at Creative Arts Agency loved the script. When Mr. McLeod requested a copy of the screenplay that had been submitted, he was surprised to see that the title page said "Producer: Mark Williams/Story by McLeod and Williams"; however, neither of the Williams brothers (his managers) had worked on the screenplay with him. Mr. McLeod had written the script alone.

27. Mr. McLeod then nonetheless trusted that his managers were acting in his best interest and had no desire to say or do anything that might derail any progress toward the production of his script.

28. In or about June 2012, Eric introduced Mr. McLeod to his brother Mark for the first time. Over the ensuing years, Mark took a lead role in managing the marketing of Mr. McLeod's script. Over the next few years, several directors, actors and others expressed interest in making a movie from the script. These efforts at producing a movie from the script took a variety of paths and Mr. McLeod was advised by his managers to edit his script as requested by interested parties. It is not unusual for a script to have several unsuccessful production tries and the details of these unconsummated efforts are not at issue in this matter. However, during the course of these efforts, Mr. McLeod's managers engaged in conduct which conflicted with their client's interests, and which set the stage for their ultimate betrayal of their client on *Copshop*.

29. Over the course of these pre-*Copshop* years, ZGM advised Mr. McLeod that he must enter into an exclusive option agreement assigning the rights to the screenplay to Mark. Specifically, Eric, acting in the capacity as Mr. McLeod's manager told him that it was necessary to give an exclusive option to Mark to keep the script alive in the market. Of course, as Mr. McLeod's fiduciaries, ZGM possessed an obligation to find the **best possible** person or entity to produce his screenplay – and not to limit those possibilities to those willing to do business with Mark (the holder of the option). Mr. McLeod relied on the advice of his managers and, in 2013 and 2014 optioned the screenplay to "Mark Williams Films,

LLC." After the events surrounding *Copshop* detailed below, it is now obvious that these options given to Mark were ***not*** to benefit Mr. McLeod, but rather were designed to create a role for ZGM as a producer on *Copshop*.

30. The option agreements described in this complaint are typical of those used in the entertainment industry: In exchange for a fee, the writer of a screenplay, like Mr. McLeod, grants a third party the exclusive right to produce the screenplay into a film, for a specific period of time. These option agreements between Mr. McLeod and Mark are significant because they reveal ZGM to be acting for its own and Mark's interest, and not on behalf of its client Mr. McLeod. Notably, these option agreements also admit Mr. McLeod's ownership of the screenplay (a fact that will become magnified in the events relating to the production of *Copshop*). The option agreements between Mr. McLeod and Mark's company, ***which were drafted by ZGM***, define Mr. McLeod as the sole owner of the screenplay. In fact all of the option agreements alleged in this Complaint were presented to Mr. McLeod after ZGM had negotiated the terms with various third parties (or Mark himself) and supposedly on Mr. McLeod's behalf and in his best interest.

31. When, during this pre-*Copshop* period, Mr. McLeod expressed concerns about Mark attempting to make unilateral decisions about various developments of the screenplay, his managers insisted (supposedly on behalf of Mr. McLeod) that this was the best path to follow. It is now clear that the efforts of ZGM during this period were designed to take advantage of Mr. McLeod, to harm him financially to the net benefit of ZGM and that all of this foreshadowed the egregious conduct of Eric, Mark and ZGM in the dealmaking for *Copshop*.

## *Copshop*

32. The journey to the production of *Copshop* evidently began in early 2016 when Sculptor Media expressed genuine and serious interest in producing the film. At that time, Mark had the option to acquire the screenplay based on the agreements described above. At this point, ZGM advised Mr. McLeod that the

1  project would now move "fairly quickly" and advised Mr. McLeod to extend the term of his option to Mark. Thereafter, nothing much happened.

33. Things heated up again in early 2018. In January 2018, on the advice of ZGM, Mr. McLeod provided an eighteen-month (18-month) option agreement (negotiated by ZGM) to Sculptor Media; this option expired in the middle of 2019.

34. In November 2019, Eric emailed Mr. McLeod about renewed interest in the screenplay by Sculptor. Notably, Eric acknowledged (again) Mr. McLeod's ownership of the screenplay when he asked in an email "you haven't optioned it elsewhere at this stage, have you?" A few months later, on March 6, 2020, ZGM presented Mr. McLeod with an eighteen-month option agreement it had negotiated with Sculptor on Mr. McLeod's behalf.

35. Under this March 6, 2020, option agreement, Mr. McLeod agreed that the purchase price for the screenplay, if the option were exercised, would be two and one-half percent (2.5%) of the budget for any film that was produced but with a cap of one hundred and twenty-five thousand dollars ($125,000.00). ZGM presented this agreement as reasonable under the circumstances and raised no concerns with regards to the cap on Mr. McLeod's fee. This was a misrepresentation and a concealment by ZGM and the Williams brothers because they knew at the time that the budget for the film would be in an amount that the cap of $125,000 was many times less than he was entitled to earn. The managers were obligated to provide this information to their client. The script had been written on the specific advice of ZGM to construct an "ultra-contained" film that could be shot primarily in one location with a limited number of characters in order to accommodate an extremely low or micro budget, with no reasonable expectation by Mr. McLeod of a budget that could far exceed the limits of the purchase price cap imposed.

36. At the time ZGM, Eric and Mark advised Mr. McLeod to sign the option agreement with Sculptor, Defendants had at least the following conflicts of

interest which they did not disclose to Mr. McLeod and which caused them to act against their client's best interests when they advised him to accept the $125,000 cap: (a) ZGM had an existing or anticipated business relationship with Sculptor for the purpose of producing a film based on the screenplay, and thus Defendants were "negotiating" on behalf of their client with a business partner whereby they had a conflicting interest in reducing the fee to the screenwriter in order to leave more money for ZGM and Sculptor; (b) Defendants knew or anticipated that the budget for the film would be such that the cap of $125,000 on Mr. McLeod's fee was predatorily insufficient by any measure, *i.e.*, he should have been paid close to $1 million; and (c) ZGM intended to manipulate the allocation of "story" and "screenwriting" credit on any film to include Mark, even though ZGM knew (and had previously admitted) that Mr. McLeod was the sole author and owner of the script.

37. On or about August 21, 2020, Mark advised Mr. McLeod that the name for the movie had been changed from *Police Station* to *Copshop* and that production was scheduled to start on October 1, 2020.

38. Just days before the film was to start production, Eric emailed Mr. McLeod about wrapping up some "paperwork" for the film. Virtually everything Eric did next violated his contractual and fiduciary obligations to Mr. McLeod.

39. First, Eric created a timing emergency to exert pressure **on his own client to relinquish rights**. Eric waited to email Mr. McLeod until Sunday night, September 27, 2020, and advised him that production was starting two days later on Wednesday, September 30, 2020. Eric later rushed Mr. McLeod when he claimed that the production was cancelling rehearsals pending receipt of Mr. McLeod's documents which related to "chain of title."

40. Second, Eric did not represent his client's interests during this period of time; instead, he sought to benefit his brother, himself and ZGM. In his Sunday night email, Eric blithely writes that "I'm assuming that Matt has talked to you

11
**COMPLAINT AND DEMAND FOR JURY TRIAL**

about the Story By credit, Which will be shared between you and Mark." Presumably, Eric knew full well that Mr. McLeod had no idea about this last minute attempt to give Mark credit on *Copshop*. And, in fact, in every prior option agreement – including the most recent with Sculptor (negotiated by ZGM) – Mr. McLeod was identified as the sole owner of the script **without any reference to Mark**. Eric used this last-minute time crunch to shoehorn his bother into the credits for the movie and to take sole credit away from Mr. McLeod.

41. Third, Eric advised and recommended that Mr. McLeod enter into new assignment agreements for the rights to the screenplay to a brand-new entity, "ORSD, LLC." Eric told Mr. McLeod that this new option agreement was required to fix the "chain of title." (Mr. McLeod understands that ORSD was the entity created to "operate" the film during production.) At this point in time, there is no doubt that Defendants knew that the budget for the film was such that a cap of $125,000 was simply untenable. However, none of them disclosed this information to their client as required. Even worse, Defendants proceeded to negotiate an agreement with ORSD which contained the same $125,000 cap on Mr. McLeod's fee which Defendants knew was grossly insufficient given the film's budget. Defendants kept the actual budget of the film secret from Mr. McLeod and advised him to accept far less money than he was entitled in order that they would be able to take larger fees for themselves and otherwise benefit from their affiliation with *Copshop*. Because Mr. McLeod had no idea of the actual budget of the film and in reliance on his managers abiding by their contractual and fiduciary duties, he assigned the screenplay's rights to ORSD and accepted the woefully deficient cap.

42. Moreover, Eric used the threat of shutting down the movie to pressure his client to agree with ORSD that Eric's brother Mark would share credit for the creation of the "story" which Mr. McLeod had written on his own. It is difficult to conceive of a more profound conflict of interest.

43. In their haste to push through this predatory "paperwork" it appears

that ZGM may have created an issue with the chain of title for the film. At the time, ZGM purported to have Mr. McLeod assign the screenplay rights to ORSD, he had previously given an exclusive option to Sculptor. If there existed a genuine gap in the chain of title, any ethical manager acting on behalf of their client, would have used that open issue to negotiate on the client's behalf. ZGM did just the opposite and used the urgency of the moment to harm its client and to benefit itself, the Williams brothers and likely other producers on the show.

44. Plaintiff was paid his fee of $125,000, nothing more, and to add insult to injury, his managers took a ten percent fee for representing him in the deal.

## The WGA Arbitration

45. In or about the Spring of 2021, the Writers Guild of America undertook an arbitration of the story and writing credits for the film. This Complaint does not seek to challenge or alter the credits determined by the WGA, which is its purview. The WGA concluded that the "Story By" credit should be Mark and Plaintiff and the "Screenplay By" credit should be Plaintiff and Joe Carnahan (the film's director). During the course of the WGA proceedings, Mr. McLeod discovered that Eric, Mark and ZGM had at some point prior to production written and submitted a fabricated "outline" to Sculptor as an official chain of title document, without their client's knowledge, in order for Mark to falsely claim his role as an author in the *Copshop* script.

46. The fact ZGM violated its fiduciary obligations by working to obtain credit for Mark has harmed Mr. McLeod with respect to participation in any profits from the film, with respect to residuals and in a diminished precedent for future work. This Complaint seeks monetary compensation for these losses.

## FIRST CAUSE OF ACTION

### (Breach of Contract against Defendants)

47. Plaintiff incorporates and realleges paragraphs 1 through 46 as if fully set forth herein.

48. During the time period relevant herein, Plaintiff and Defendants were parties to an oral agreement whereby their agreed that Defendants, and each of them, would represent Plaintiff as his manager in connection with his work as a writer and that he would pay them a fifteen (15%) commission on his gross earnings.

49. Plaintiff has performed each and every act, condition and covenant incumbent upon him in accordance with the terms of this contract, except as excused, waived or prevented by Defendants, or any of them.

50. Defendants, and each of them, materially breached the terms of the contract as alleged above, including and especially by failing to act in the best interests of their client.

51. Plaintiff has been damaged by the Defendants, and each of their contractual breaches.

52. Defendants, and each of them, are liable for any loss or damages, subject to proof, suffered by Plaintiff as a direct and proximate result of Defendants, and each of their acts and omissions alleged herein. While Plaintiff cannot ascertain at this time the full nature, extent or amount of damages suffered as a result of Defendant's conduct, Plaintiff is informed and believes, and on that basis alleges, that it is not less than $1 million.

## SECOND CAUSE OF ACTION

**(Breach of Fiduciary Duty against Defendants)**

53. Plaintiff incorporates and realleges paragraphs 1 through 52 as if fully set forth herein.

54. By virtue of the relationship between Plaintiff and Defendants, the Defendants, and each of them owed Plaintiff a fiduciary duty. A fiduciary duty imposed upon Defendants, and each of them, a duty to act with the utmost good faith, to act in the best interests of Plaintiff, and a duty to act with undivided loyalty to Plaintiff.

55. Defendants, and each of them, breached and violated their fiduciary duties to Plaintiff in the ways alleged above, including without limitation by acting for their own, and each of their interests and against Plaintiff's interests in the negotiation of Plaintiff's screenwriting fee and the credit for his work on the film.

56. Plaintiff has been damaged in an amount of at least $1 million including the underpayment of the screenwriting fee to which he was rightfully entitled and fees and other residuals he would have earned had defendants, and each of them, not interfered with his rightful credits for *Copshop*.

57. Defendants, and each of them, acted with oppression, fraud and/or malice and should be required to pay punitive and/or exemplary damages in an amount of not less than three million dollars.

## THIRD CAUSE OF ACTION

### (Fraud and Concealment against Defendants)

58. Plaintiff incorporates and realleges paragraphs 1 through 57 as if fully set forth herein.

59. Defendants, and each of them, made misrepresentations to Plaintiff that the budget for *Copshop* would be sufficiently small that a cap on his fee of $125,000 would represent just and proper compensation, and further, Defendants, and each of them, concealed from Plaintiff the actual budget for *Copshop* when they advised him to, twice, sign agreements to cap his fee at $125,000.

60. At the time Defendants, and each of them, made these misrepresentations and/or concealed the information about the true budget for *Copshop* they knew that what they were saying was false and/or that they were concealing material information from their client, Plaintiff.

61. Plaintiff reasonably and justifiably relied on these misrepresentations and/or was deceived by Defendants, and each of their, concealment of material facts regarding the budget for *Copshop*.

62. Defendants, and each of their, conduct was a substantial factor in causing harm to Plaintiff, the amount of which is at least $1 million.

63. Defendants, and each of them, acted with oppression, fraud and/or malice and should be required to pay punitive and/or exemplary damages in an amount of not less than three million dollars.

## FOURTH CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing against Defendants)

64. Plaintiff incorporates and realleges paragraphs 1 through 63 as if fully set forth herein.

65. During the time period relevant herein, Plaintiff and Defendants were parties to the oral agreement alleged above. This oral agreement contained an implied covenant of fair dealing.

66. Plaintiff has performed each and every act, condition and covenant incumbent upon him in accordance with the terms of this contract, except as excused, waived or prevented by Defendants, or any of them.

67. Defendants, and each of them, materially breached the implied covenant of good faith and fair dealing as alleged above, including and especially by failing to act in the best interests of their client.

68. Plaintiff has been damaged by the Defendants, and each of their, breaches of the implied covenant in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### (Quantum Meruit against Defendants)

69. Plaintiff incorporates and realleges paragraphs 1 through 68 as if fully set forth herein.

70. As alleged above, Defendants, and each of them, advised Plaintiff to enter into two agreements which capped his screenwriting fee at $125,000 and they did so in violation of their contractual and fiduciary obligations to Plaintiff. Plaintiff

undertook this action to benefit themselves as producers and participants in the movie *Copshop*.

71. The monies earned and otherwise obtained by Defendants, and each of them, from *Copshop* rightfully belong to Plaintiff under the doctrine of Quantum Meruit and Plaintiff is entitled to a constructive trust on such monies.

72. Plaintiff is entitled to recover from Defendants, and each of them, the monies Defendants wrongfully earned from Copshop.

73. Accordingly, Defendants, and each of them owes Plaintiff an amount not less than the jurisdictional limits of this Court, subject to proof at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief as follows:

### **AS TO THE FIRST CAUSE OF ACTION**
### **(Breach of Oral Contract)**

1. For general, incidental, and consequential damages according to proof at trial.

2. Prejudgment interest.

### **AS TO THE SECOND CAUSE OF ACTION**
### **(Breach of Fiduciary Duty)**

1. For general, incidental, and consequential damages according to proof at trial.

2. For exemplary damages.

### **AS TO THE THIRD CAUSE OF ACTION**
### **(Fraud and Concealment)**

1. For general, incidental, and consequential damages according to proof at trial.

2. For exemplary damages.

3. For a constructive trust on the monies earned and/or acquired by Defendants, and each of them, from *Copshop*.

## AS TO THE FOURTH CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

4. For general, incidental, and consequential damages according to proof at trial.

## AS TO THE FIFTH CAUSE OF ACTION

### (Quantum Meruit)

1. For the reasonable value of the earning that Plaintiff was entitled to.

2. For a constructive trust on the monies earned and/or acquired by Defendants, and each of them, from *Copshop*.

## AS TO ALL CAUSES OF ACTION

1. For pre-judgment interest at the legal rate for all amounts owed;

2. For costs of suit incurred herein; and

3. For such further legal or equitable relief as this Court may deem just and proper under the circumstances.

Respectfully submitted,

Dated: March 8, 2022        EARLY SULLIVAN WRIGHT
                            GIZER & McRAE LLP


By: */s/ Devin A. McRae*
    Devin A. McRae
    Jeremy J. F. Gray
    Ryan M. Hemar
    Attorneys for Plaintiff
    KURT MCLEOD

/ / /
/ / /
/ / /
/ / /

## DEMAND FOR JURY TRIAL

Mr. McLeod hereby demands a trial by jury.

Respectfully submitted,

Dated: March 8, 2022

EARLY SULLIVAN WRIGHT
GIZER & McRAE LLP

By: */s/ Devin A. McRae*
Devin A. McRae
Jeremy J. F. Gray
Ryan M. Hemar
Attorneys for Plaintiff
KURT MCLEOD

