1
2
3
4
5

Robert M. Barta (SBN: 108205)
rbarta@bartatate.com
Gregory T. Goldberg (SBN: 349139)
ggoldberg@bartatate.com
**BARTA ⎤ TATE**
1801 Century Park East, Suite 1200
Los Angeles, California 90067
Telephone: (310) 479-1454
Facsimile: (310) 478-1439

6
7

Attorneys for Defendants
ZERO GRAVITY MANAGEMENT,
MARK WILLIAMS and ERIC WILLIAMS

8
9
10
11
12

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

13

KURT MCLEOD, an individual,

14

Plaintiff,

15

v.

16

ZERO GRAVITY MANAGEMENT,
an unknown business entity; MARK
WILLIAMS, an individual; ERIC
WILLIAMS, an individual; and
DOES 1-50, inclusive,

17
18
19
20

Defendants.

21
22

Case No. 2:22−cv−01547 FWS-AGR

**DEFENDANTS' MEMORANDUM
OF POINTS & AUTHORITIES IN
SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT**

Date:        November 30, 2023
Time:        10:00 AM
Dept.:        10D

Hon. Fred W. Slaughter

Complaint Filed:        March 8, 2022

23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................1

II.    BACKGROUND ....................................................................................4

     A.    The Representation Agreement.....................................................4

     B.    *The Police Station.* ......................................................................5

     C.    The Development of *Police Station.*............................................6

     D.    Chain of Title. .............................................................................8

     E.    The WGA Arbitration. .................................................................9

III.   STANDARD OF REVIEW ...................................................................9

IV.   ARGUMENT .......................................................................................10

     A.    Plaintiff's First Cause of Action Fails to Establish a Claim for Breach of Contract as a Matter of Law......................................11

     B.    McLeod Cannot Establish that Mark Breached a Fiduciary Duty as Matter of Law ......................................................................13

     C.    Neither Mark, Eric, nor ZGM Breached the Implied Covenant of Good Faith and Fair Dealing Stemming from McLeod's Oral Representation Agreement.........................................................16

     D.    McLeod Cannot State a Case of Fraud and Concealment. .........20

     E.    The Principle of Quantum Meruit is Inapplicable as a Matter of Law..............................................................................................23

V.    CONCLUSION ...................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*1-800 Contacts, Inc. v. Steinberg*, 132 Cal. Rptr. 2d 789 (2003) ............................. 13

*Abdelhamid v. Fire Ins. Exchange*, 182 Cal.App.4th 990 (2010) ............................ 11

*Abromson v. Am. Pac. Corp.*, 114 F.3d 898 (9th Cir. 1997) .................................... 10

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................ 10

*Bernard v. State Farm Mut. Auto. Ins. Co.*, 158 Cal. App. 4th 304 (2007) .............. 17

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371 (1990) ..... 11, 17

*Celador Int'l, Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846 (C.D. Cal. 2004) ......... 17

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................... 9, 10

*City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375 (2008) ................. 14

*Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197 (1983) 14

*Day v. Alta Bates Med. Ctr.*, 98 Cal. App. 4th 243 (2002) ...................................... 24

*E. J. Franks Constr., Inc. v. Sahota*, 226 Cal. App. 4th 1123 (2014) ...................... 24

*Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400 (2007) ........................................... 14

*Huskinson & Brown v. Wolf*, 32 Cal. 4th 453 (2004) ............................................... 24

*Matsushita Elec. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ....................................................................................................................... 10

*Orient Handel v. United States Fid. & Guar. Co.*, 192 Cal. App. 3d 684 (1987) .... 20

*Pasadena Live v. City of Pasadena*, 8 Cal. Rptr. 3d 233 (2004) ............................. 17

*Tri-Continent International Corporation v. Paris Savings & Loan Assn.* 12 Cal.App.4th 1354 (1994) ...................................................................................... 11

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I.      Introduction

This is a dispute between a screenwriter, his manager, and a film producer over money. The Plaintiff, Kurt McLeod, is a novice screenwriter whose first and only professional screenwriting credit derives from the film at issue in this case, entitled *Copshop*. Defendant, Mark Williams, has worked as a producer, writer, and director, with more than thirty professional credits to his name and counting. Mark produced *Copshop*. Mark is also the managing member of Mark Williams Films, LLC d/b/a Zero Gravity Management ("ZGM"), a dual-purpose entity, home to managers that help shepherd creators through their careers, and producers who bring film and television projects to life. The Defendant, Eric Williams, is a talent manager. Eric is an independent contractor for ZGM and also Mark's brother. Occasionally, as here, producers associated with ZGM produce projects on behalf of ZGM managers' clients.

Prior to meeting Mark and Eric, McLeod was not a working screenwriter; he was an aspiring law student based in Canada. Since working with Mark, Eric, and ZGM, McLeod has accomplished something relatively few other screenwriters have: he is a credited writer on a feature film that was released in theaters, and he is a member of the Writers Guild of America ("WGA"). It is no exaggeration to state that McLeod owes his screenwriting career to Mark, Eric, and ZGM.

To begin with, ZGM discovered McLeod. At the time, McLeod was living in Canada, far from ZGM and the film industry in Los Angeles. Eric and ZGM agreed to manage McLeod's career, and Eric provided McLeod with several original feature film concepts that Mark had created. Each concept included critical story elements, such as main characters, key plot points, and settings. Together, McLeod and Eric fleshed out one of Mark's concepts into a screenplay that McLeod drafted, called *Police Station*.

ZGM created a market for *Police Station* by sharing it with actors, producers, directors, and agents across the film industry. With no contacts in the film industry, McLeod relied on Mark, Eric and ZGM to promote and market *Police Station*. Despite receiving many rejections, Mark, Eric, and ZGM remained committed to *Police Station*. Mark, serving as a producer, successfully recruited Gerard Butler, a well-known actor, to play a leading role. Mark also secured film financing through a co-producer called Sculptor Media, LLC ("Sculptor"). Joe Carnahan, an accomplished writer and director, signed on, and transformed McLeod's draft screenplay into a production-ready shooting script that he renamed *Copshop*.

*Copshop* was released in theaters in September 2021. McLeod's contribution to *Copshop* was limited to developing, writing, and revising a draft screenplay based on ZGM's *Police Station* concept. McLeod did not attract talent, secure film financing, assist with physical production, or influence the film's distribution.

Thanks to their Eric, Mark and ZGM's efforts, McLeod was paid handsomely, earning a six-figure payday, despite never having written professionally, nor being a guild member. In fact, McLeod earned the maximum possible agreed-upon purchase price for *Police Station*. Unsurprisingly, McLeod was initially thrilled with Mark, Eric, and ZGM's efforts. Since *Copshop*'s release, McLeod has continued to earn substantial additional income from the film, including more than $100,000 in residual payments and counting.

Despite all that Mark, Eric, and ZGM did to get *Copshop* made, and to help launch McLeod's screenwriting career, McLeod now claims they owe him more, a lot more.

- First, McLeod seeks damages for breach of contract. Notably, McLeod is not claiming to have been paid less than what he was owed under any contract. Rather, he is claiming he should have gotten a richer deal.

- Second, McLeod alleges breach of fiduciary duty, claiming Mark, Eric, and ZGM acted against his interests in multiple ways. In fact, however, Mark, Eric, and ZGM's interests were aligned with McLeod's. As a result, of Mark, Eric, and ZGM, McLeod reaped, and continues to reap, financial benefits and was inducted into the WGA. Further, Mark's claim to share story credit was vindicated by WGA.

- Third, McLeod alleges Mark, Eric, and ZGM breached the implied covenant of good faith and fair dealing by failing to act in McLeod's best interest. However,

Defendants always treated McLeod fairly, and served his best interests.

- Fourth, McLeod claims Mark, Eric and ZGM lied to him or failed to disclose information about the budget for *Copshop*. Defendants shared the information they had with McLeod or his attorney, and McLeod was not damaged.

- Fifth, McLeod asserts a claim for quantum meruit. However, having written on *Police Station* on spec, McLeod had no reasonable expectation to receive compensation from the project.

## II.    Background

**A.    The Representation Agreement.** On March 25, 2011, McLeod entered into a written representation agreement with Eric and ZGM. (Ex. 1, Zero Gravity Management Representation Agreement, March 25, 2011). The agreement contained seven substantive provisions, namely: (1) Term of Agreement; (2) Commissions; (3) Producing and Packaging; (4) Cooperation; (5) Warranties and Indemnities; (6) More Formal Agreement; and (7) Governing Law (Id.).

Terms 1 through 4 are pertinent. Under Term 1, the agreement spanned two years, from March 25, 2011, through March 25, 2013. (*Id.*) Under Term 2, ZGM was entitled to earn a fifteen per cent commission on McLeod's screenwriting income. (*Id.*) Under Term 3, McLeod agreed that ZGM could work as a producer on his projects, including earning separate income and/or credit as a producer, provided ZGM did not create any additional financial obligation for McLeod beyond ZGM's

commission. (*Id.*) Under Term 4, McLeod agreed to share "story by" credit[1] with

ZGM, "in the event a project is developed based on a concept supplied by ZG[M]."

(*Id.*) After the agreement lapsed, in 2013, ZGM continued to serve as McLeod's

manager. (Ex. 2, Plaintiff's Responses to RFAs, at 9.)

     **B.**    ***The Police Station.*** After executing the written representation

agreement, Eric emailed McLeod approximately ten different original feature film

concepts, including:

> *The Police Station*
> Very contained Action-Thriller
> Our guy has issues. Mental and financial. And he's
> crossed the wrong people. A hitman, who has his own
> issues... Having previously screwed up a past job... Must
> kill our guy by morning. Or he will die. After the first
> bullet misses... Our guy decides to get himself arrested...
> That way he'll be safe behind bars. So, he beats on a cop.
> Smashes into a cop car. Etc. Our guy is arrested. And to
> his dismay... The hitman is arrested as well... On purpose.
> As he intends to finish the job tonight... Even if it has to
> happen in the police station.
> Cat and mouse between them in the police station
> overnight. (Ex. 3, Decl. of Mark Williams; Ex. 2 at 20.)

Eric advised McLeod throughout the writing process, and McLeod completed a draft

screenplay based on *Police Station* in 2011. (*Id.* at 69.)

---

[1] Credits awarded to screenwriters for feature films include: (a) "story by," consisting of "basic narrative, idea, theme or outline indicating character development and action;" (b) "screenplay by," consisting of "individual scenes and full dialogue, together with such prior treatment, basic adaptation, continuity, scenario, and dialogue as shall be used in, and represent substantial contributions to the final script;" and (c) "written by," which incorporates the elements of both "story by," and "screenplay by." (*See*, https://www.wga.org/contracts/credits/manuals/screen-credits-manual)

**C.** **The Development of** *Police Station***.**  The development of *Police Station* proceeded over nine years. (*Id.*) During this timeframe, McLeod entered into a series of option agreements. (Ex. 4-8, Option Agreements.) McLeod testified the option agreements he signed were "typical of those used in the entertainment industry." (Ex. 9, Complaint, at 9.) Under an option agreement, a producer secures an exclusive right to purchase material from a writer for a limited time period. In exchange for the exclusivity, the producer typically pays the writer a fee. During the option period, a producer goes to work packaging the elements necessary to create a motion picture, including, but not limited to, recruiting actors, a director, and financing. (Ex. 3.)

From 2014 through approximately October 2016, Mark optioned *Police Station* from McLeod through Mark Williams Films, LLC. (Ex. 3.) Prior to executing an option agreement with Mark Williams Films, LLC, around April 2014, McLeod hired, Matthew Sugarman of the Weintraub Tobin ("Weintraub") law firm to represent him in contract negotiations. (Ex. 10, Dep. of Pl., at 85.) At this point, Eric had informed McLeod the budget for *Police Station* could reach as high as $10,000,000. (*Id.* at 105.) Sugarman and Weintraub represented McLeod in connection with every agreement he signed related to *Police Station*. (*Id.* at 85.)

Each agreement McLeod executed included several key terms that never changed. Notably, each agreement included a provision agreeing that "Screenplay Credit" (e.g., "story by") was subject to the WGA's arbitration procedure—

meaning, WGA, not the parties, would independently award writing credit. (Ex. 4-8). Second, each agreement included the same term for the purchase price owed to McLeod in the event the option was exercised. (*Id.*)

Specifically, the purchase price was calculated at 2.5% of the film's budget, subject to a floor of $75,000 and a ceiling of $125,000. (Ex. 10 at 96-97.) Eric Gold, a principal at Sculptor, explained that producers commonly negotiate purchase price floors and ceilings into screenwriters' deals. (Ex. 11 – Dep. of Sculptor Media, LLC, at 105-106). The purpose of a price floor is to protect the writer, guaranteeing the writer minimum compensation. (*Id.* at 108.) Conversely, a price ceiling protects the production, ensuring a screenwriter's fee does jeopardize the production. (*Id.*) Sugarman agreed price ceilings are common, particularly for first-time writers. (Ex. 12, Dep. of Matthew Sugarman, at 45.)

In 2016, Mark, acting as producer, recruited Gerard Butler to act in a leading role in *Police Station*. (Ex. 10 at 110-112.) In December, Eric advised Sugarman of Mr. Butler's involvement and that ZGM had secured financing up to $20,000,000. (Ex. 13 – Dec. 15, 2016 Email.) After Sugarman learned of Mr. Butler's involvement, he and Weitraub negotiated multiple agreements on McLeod's behalf, including a March 6, 2020, Option Agreement and September 24, 2020, Amended and Restated Screenplay Purchase Agreement ("ARSPA.") (Ex. 4-8.)

The counterparty was no longer Mark Williams Films, LLC; it was Sculptor, the company with access to financing that Mark brought on to co-produce. (Ex. 3.)

The purchase price for *Police Station* never changed. In fact, while negotiating the March 6, 2020, Option, Sculptor unsuccessfully sought to reduce the purchase price paid to McLeod, but Sugarman and ZGM resisted. (Ex. 12 at 40; Ex. 14 – Feb 2020 Emails.)

**D.     Chain of Title.** In September 2020, Sculptor's attorney learned that McLeod's screenplay, since rewritten by Mr. Carnahan, was based on Mark's original concept for *Police Station*. (Ex. 15 – Sep. 2020 emails.) This created a chain-of-title issue because McLeod could not assert unencumbered title to a screenplay based on an original concept created by Mark. (Ex. 3.) To fix the issue, Sculptor (technically, ORSD, LLC, a single-purpose vehicle created by Sculptor to produce *Copshop*) requested that McLeod sign the ARSPA. (Ex. 15.) Sculptor's attorney requested McLeod sign within one day. (*Id.*)

McLeod was thrilled. By signing the ARSPA, McLeod secured the $125,000 purchase price he had been anticipating since 2014. (Ex. 10 at 204.) He sent a congratulatory email to Eric, expressing gratitude for Eric, Mark, and ZGM's efforts, and shrugging off sharing story credit with Mark, stating: "if this doesn't affect my compensation in any way, and if it gets Mark an extra $30K, I'm all for it. He earned it after the hard time I gave him:)." (Ex. 16 – KM email to EW 9/2020.) Mark was paid $29,069 for the shared story by credit, none of which was taxed against McLeod. (Ex. 3 at 86.) In fact, Mark returned one-half of his story compensation to Sculptor in order to ensure McLeod received the full purchase price

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

of $125,000. The only commission paid to ZGM was $12,500. (Ex. 17, Dep. of Eric Williams, at 121.)

**E.    The WGA Arbitration.** The WGA independently adjudicated the "story by" and "screenplay by" credits for *Copshop* in March 2021. (Ex. 18, WGA Arbitration Award.) Importantly, the WGA's arbitration panel does not consider contracts; it only considers original submissions related to the material at issue. (Ex. 17 at 133.) After reviewing Mark's concept for *Police Station*, alongside the outlines and screenplay drafts McLeod prepared based on Mark's concept, WGA awarded shared "story by" credit to Mark and McLeod. (Ex. 10 at 200.)

Shortly before *Copshop* was released in theaters, McLeod saw an interview where Mr. Carnahan stated the final budget for *Copshop* had grown to approximately $40,000,000. Soon thereafter, McLeod severed ties with ZGM and filed this lawsuit (Ex. 10 at 257-258.)

## III.    Standard of Review

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." (Fed. R. Civ. P. 56(a).) The moving party bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment. (*See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).)

If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also* Fed. R. Civ. P. 56(c), (e).) Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (*Celotex*, 477 U.S. at 322; *see also Abromson v. Am. Pac. Corp.*, 114 F.3d 898, 902 (9th Cir. 1997).)

In order to satisfy its burden, the nonmoving party must show more than the mere existence of a scintilla of evidence and "do more than simply show that there is some metaphysical doubt as to the material facts." (*Matsushita Elec. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. (*See Matsushita*, 475 U.S. at 587.)

## IV.   Argument

The Court should grant summary judgment to Defendants on each of Plaintiff's claims, including breach of contract, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, fraud and concealment, and quantum meruit. Plaintiff has failed to adduce facts to establish the essential

elements of his claims. Accordingly, Defendants are entitled to judgment as a matter of law.

### A. Plaintiff's First Cause of Action Fails to Establish a Claim for Breach of Contract as a Matter of Law.

The elements of a breach of contract claim include: (a) the existence of a contract; (b) plaintiff's performance or excuse for nonperformance; (c) defendant's breach; and (d) damage to plaintiff resulting therefrom. *Abdelhamid v. Fire Ins. Exchange*, 182 Cal.App.4th 990, 999 (2010); *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App.3d 1371, 1388 (1990). McLeod cannot establish a *prima facie* case for breach of contract because he has failed to adduce evidence that ZGM breached the terms of their oral representation agreement. It is a fundamental hornbook principle that a plaintiff cannot assert a claim for breach of contract against one who is not a party to the contract. (*Tri-Continent International Corporation v. Paris Savings & Loan Assn.* 12 Cal.App.4th 1354, 1359 (1994)).

The parties agree that Eric and ZGM continued to represent McLeod, pursuant to an oral agreement, after their written representation agreement lapsed. (Ex. 10 at 264.) The parties disagree regarding the alleged terms. According to Eric:

> After the initial term of the Representation Agreement, [ZGM] continued to represent McLeod under the terms of the Representation Agreement. There was no other agreement between McLeod and Zero Gravity Management (or Mark or me), and specifically there was no oral agreement changing or deleting terms of the Representation Agreement or creating a new agreement. (Ex. 19, Dec. of Eric Williams, ¶ 5.)

McLeod apparently drew the opposite conclusion. McLeod understood the oral agreement consisted of, "[ZGM] telling me that they're my managers, me telling [ZGM] they're my managers and [ZGM] acting and holding themselves forth to third parties as my managers." (Ex. 10 at 55-56.) McLeod believes that neither he nor ZGM were bound by the terms of the lapsed written representation agreement. (*Id.* at 57-60.)

This Court agreed, in part, with McLeod in its Order Denying Defendants' Motion to Compel Arbitration and Stay Proceedings, on December 6, 2022. (ECF No. 16.) There, the Court declined to enforce Paragraph 7 of the written representation agreement which would have compelled arbitration. (*Id.* at 5.)

Taken together, it is clear McLeod and ZGM intended to remain in a manager-client relationship after the written representation agreement lapsed; however, the express terms appear limited to: (a) "the William brothers agreed to serve as McLeod's managers (with the accompanying fiduciary obligations);" and (b) "McLeod agreed to compensate ZGM in an amount equal to fifteen percent (15%) of his gross compensation from any projects." (Ex. 9 at 7). McLeod alleges that Mark, Eric, and ZGM breached those terms by "failing to act in the best interest of [McLeod]." (*Id.* at 14.)

Based upon the foregoing and the evidence adduced in discovery, McLeod's breach of contract claim must fail. There is no factual dispute regarding whether Eric and ZGM continued to serve as McLeod's manager after the written

representation agreement lapsed. (Ex. 10 at 264.) Further, there is no factual dispute that Eric earned commission of $12,500 after *Police Station* sold to Sculptor (aka ORSD). (Ex. 17 at 19.) To the extent McLeod alleges Eric, Mark, and ZGM breached implied fiduciary obligations, those allegations sound in tort, not contract, and they are addressed hereinbelow. To the extent McLeod alleges Eric, Mark and ZGM breached implied contract terms, those allegations are also addressed hereinbelow.

In sum, based upon the limited express contract terms alleged in McLeod's complaint, McLeod's claim must fail because there is no evidence of a breach. Accordingly, this Court should grant Defendants summary judgment on Plaintiff's First Cause of Action. In the alternative, this Court should grant summary judgment to Mark Williams, individually, because he was not an individual party to any agreement with McLeod.

**B.    McLeod Cannot Establish that Mark Breached a Fiduciary Duty as Matter of Law**

"Breach of fiduciary duty is a tort that by definition may be committed by only a limited class of persons." (*1-800 Contacts, Inc. v. Steinberg*, 107 Cal. App. 4th 568, 592, 132 Cal. Rptr. 2d 789, 808 (2003).) "'[B]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law.'" (*City of Hope Nat'l Med. Ctr. v.*

*Genentech, Inc.*, 43 Cal. 4th 375, 386 (2008), citing *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 221 (1983).) During the course of the fiduciary-beneficiary relationship, the fiduciary may not undertake or participate in activities adverse to the interests of the beneficiary. (*Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 416 (2007).)

Defendants concede that a fiduciary relationship likely exists between a manager and a client. However, McLeod can point to no precedent imposing a fiduciary duty on a film producer. ZGM is divided into two core competencies: (a) film and television production, and (b) client management. (Ex. 3 at 1.) Mark Williams works exclusively as a producer. (*Id.*) Eric Williams works exclusively as a manager. (*Id.*) Mark has never served as McLeod's manager (*Id.*) Mark's role as a producer on *Police Station* is evidenced by several factors, not limited to (a) Mark's creation of the concept for *Police Station*; (b) option agreements Mark entered into on behalf of Mark Williams Films, LLC; and (c) Mark's credited role as a producer on *Copshop*.

Because Mark and Eric serve in distinct individual roles stemming from their unique responsibilities as producer and manager, respectively, Mark and Eric are not subject to the same duties. Mark, as producer, has never owed a fiduciary duty to McLeod in his individual capacity. Accordingly, this Court should award summary judgment to Mark, in his individual capacity, on Plaintiff's Second Cause of Action.

Defendants further submit that the undisputed facts fail to show Eric or ZGM breached a fiduciary duty to McLeod. McLeod theorizes that ZGM breached its fiduciary duty by placing its interests ahead of his. (Ex. 9 at 15.) McLeod claims ZGM violated its obligations by: (a) "creating a timing emergency to exert pressure on [McLeod] to relinquish rights"; (b) Mark's sharing "story by" credit for *Police Station*; (c) recommending that McLeod enter into the ARSPA with ORSD; and (d) failing to renegotiate the purchase price in the agreement with ORSD.

The undisputed facts contradict McLeod's allegations. Regarding the alleged "timing emergency," ZGM did not raise the chain of title issue; Sculptor's attorney did. (Ex. 15.) Sculptor, not ZGM, requested McLeod sign the ARSPA within one day. (*Id.*) Eric testified, "As a manager, I'm a middle man, and I just give the information that's told to me. So I pass along the information. I'm not creating any sort of urgent situation." (Ex. 17 at 81.) It was up to McLeod, who was represented by counsel, to decide whether to sign the ARSPA. (Ex. 17 at 79; Ex. 20 at 120). To the extent McLeod alleges the ARSPA presented an opportunity to renegotiate the purchase price for *Police Station*, his attorney disagrees. Sugarman testified about the deal, "It was the best we could do at the time." (Ex. 12 at 78.)

Second, McLeod did not relinquish story rights by signing the ARSPA; he never had an exclusive right to *Police Station* in the first place. Under Paragraph 4 of the written representation agreement from 2011, McLeod agreed to share "story by" credit for any project "developed based on a concept supplied by ZG[M]." (*Id.*)

The parties do not dispute that the written representation agreement was effective in 2011, when Eric emailed Mark's concept for *Police Station* to McLeod or when McLeod prepared his initial draft screenplay.

Further, in each of the option agreements McLeod signed prior to the ARSPA, McLeod had agreed to defer to WGA regarding story credits. (Ex. 4-8.) WGA does not base its arbitration decisions on contractual terms; WGA adjudicates credit based solely upon original submissions. (Ex. 17 at 133.) Here, McLeod submitted Mark's original concept for *Police Station*, as well as his own original outlines and screenplay. (Ex. 10 at 200.) Based upon those submissions, WGA awarded shared "story by" credit to both Mark and McLeod. (Ex. 18.) Mark did not claim "story by" credit; WGA awarded it to him through an independent process.

In sum, the undisputed facts fail to establish that Eric or ZGM placed their interests above McLeod's interests. Accordingly, this Court should grant summary judgment to Defendants on McLeod's Second Cause of Action. In the alternative, the Court should grant summary judgment to Mark in his individual capacity.

## C.   Neither Mark, Eric, nor ZGM Breached the Implied Covenant of Good Faith and Fair Dealing Stemming from McLeod's Oral Representation Agreement.

"The covenant of good faith and fair dealing is implied in every contract to ensure that the benefits expressed in the contract are achieved." *Bernard v. State Farm Mut. Auto. Ins. Co.*, 158 Cal. App. 4th 304, 307 (2007). "The implied

covenant of good faith and fair dealing is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract." *Pasadena Live v. City of Pasadena*, 114 Cal. App. 4th 1089, 1094, 8 Cal. Rptr. 3d 233, 237 (2004). "A breach of the implied covenant of good faith and fair dealing involves something more than breach of the contractual duty itself . . . It involves unfair dealing, whether or not it also constitutes breach of a consensual contract term, prompted by a conscious and deliberate act that unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party. (*Celador Int'l, Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846, 852 (C.D. Cal. 2004), citing *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990).)

McLeod alleges ZGM breached implied terms of his oral representation agreement by acting against his best interests in connection with the March 6, 2020. Option Agreement. He claims:

> (a) ZGM had an existing or anticipated business relationship with Sculptor for the purpose of producing a film based on the screenplay, and thus Defendants were "negotiating" on behalf of their client with a business partner whereby they had a conflicting interest in reducing the fee to the screenwriter in order to leave more money for ZGM and Sculptor; (b) Defendants knew or anticipated that the budget for the film would be such that the cap of $125,000 on McLeod's fee was predatorily insufficient by any measure, *i.e.*, he should have been paid close to $1 million; and (c) ZGM intended to manipulate the allocation of "story" and "screenwriting" credit on any film to include Mark, even though ZGM knew (and

had previously admitted) that McLeod was the sole author and owner of the script. (Ex. 9 at 11.)

In other words, it appears McLeod is claiming it was against his best interest for ZGM to negotiate the March 2020 Option because Mark's involvement as a producer created a conflict of interest, and Mark's purported conflict resulted in reducing the purchase price for *Police Station* and increasing the compensation paid to Mark and Sculptor.

Several undisputed facts belie this allegation. To begin with, Sugarman, not ZGM, handled the negotiations for the March 6, 2020, Option (Ex. 14.) Sugarman testified that Eric and ZGM were involved with helping to progress the negotiation in early 2020, but Sugarman was the point person (Ex. 12 at 30.) It was Sugarman's second go around with Sculptor, having negotiated a prior *Police Station* Option in 2018. (Ex. 14 at 4.)

It was Sculptor, not ZGM, who attempted to reduce the purchase price for *Police Station*, in 2020. (Ex. 14 at 1; Ex. 12 at 40.) Nevertheless, Sugarman, supported by ZGM, persuaded Sculptor to honor the original purchase price from 2018. (Ex. 14 at 1.) Contrary to McLeod's claims, Sugarman's email exchange with Sculptor's attorney shows Sugarman, Eric and Mark working together as attorney, manager, and producer, respectively, to achieve the best possible deal for McLeod.

Second, McLeod claims that, in late February 2020, ZGM had information about the projected budget for *Police Station*, such that recommending McLeod

agree to a purchase price term capped at $125,000 was "predatorily insufficient by any measure." (Ex. 9 at 11.) McLeod's opinion regarding what he "should have been paid" is unfounded.

McLeod testified he was aware by 2014 that the projected budget for *Police Station* could potentially reach $10,000,000. (Ex. 10 at 105.) Yet, during negotiations of McLeod's January 2018 Option with Sculptor, McLeod never indicated to Sugarman he wished to seek a purchase price in excess of the $125,000 ceiling that he now claims is "predatorily insufficient." (Ex. 10 at 141-142.) By 2016, Eric had informed Sugarman that Mr. Butler's involvement in *Police Station* yielded a financing commitment for up to $20,000,000 (Ex. 13.) Yet, McLeod does not recall Sugarman telling him the January 2018 Option, with the same purchase price cap as ever, was unfair. (Ex. 10 at 149-150.) As discussed hereinabove, in 2020, Sculptor was scarcely willing to pay McLeod $125,000 for *Police Station.* (Ex. 14 at 1; Ex. 12 at 40.)

Taken together, there is no justification for the assertion that the purchase price in the March 2020 Option was "predatorily insufficient by any measure." The purchase price represented fair market value for McLeod's screenplay; no one disputed it; and McLeod repeatedly agreed to it.

Third, McLeod again claims ZGM manipulated the story credit for *Police Station* in Mark's favor and against McLeod's best interest. This assertion is

addressed in detail hereinabove in response to McLeod's breach of fiduciary duty allegations. It is unfounded.

In sum, the undisputed facts show that Defendants did not act unfairly toward McLeod or against McLeod's best interests. Thus, McLeod cannot state a claim for breach of the implied covenant of good faith and fair dealing as a matter of law. This Court should award summary judgement to Defendants on Plaintiff's Fourth Cause of Action. Alternatively, the Court should award summary judgment to Mark Williams, individually, on Plaintiff's Fourth Cause of Action because he was not an individual party to any contract with McLeod.

### D.    McLeod Cannot State a Case of Fraud and Concealment.

The elements of a cause of action for fraud or deceit are: (1) misrepresentation (false representation, concealment, or nondisclosure) of a material fact; (2) knowledge of falsity or lack of reasonable ground for belief in the truth of the representation (scienter); (3) intent to induce reliance; (4) actual and justifiable reliance by plaintiff; and (5) resulting damage. (*Orient Handel v. United States Fid. & Guar. Co.*, 192 Cal. App. 3d 684, 693 (1987).) In the case of nondisclosure, the plaintiff must prove that the nondisclosed fact was known or believed by the defendant and that defendant had a duty to disclose the fact. (Cal. Civ. Code §§ 1572(3), 1710(3).)

McLeod alleges it was "a misrepresentation and concealment" for ZGM to recommend entering into the March 6, 2020, Option and the September 24, 2020,

20

ARSPA. (Ex. 9.) In support, McLeod claims ZGM was aware, that "the budget for the film would be in an amount that the cap of $125,000 was many times less than [McLeod] was entitled to earn." (*Id.*)

McLeod's allegations fail to state a *prima facie* case because: (a) he has adduced no evidence that ZGM failed to disclose what it knew about the budget; and (b) his alleged damages are wholly unsupported and speculative.

Prior to the March 6, 2020, Option, two budgets had been prepared for *Police Station*, in July 2016 (Ex. 21, 07/05/20 Budget; Ex. 22, 07/30/20 Budget). The total amounts of each were slightly less than $13,000,000 (*Id.*) Eric denies he was ever sent a budget for *Police Station* at any time. (Ex. 17 at 87.) Mark does not deny receiving budget documents in 2016, but he stopped receiving budget documents in either April, May, or June 2020, after Joe Carnahan was hired. (Ex. 20 at 109.) McLeod testified that in 2014, Eric informed him the projected budget may go up to $10,000,000. (Ex. 10 at 105.) In December 2016, Eric informed Sugarman that ZGM had secured financing up to $20,000,000. (Ex. 13.)

Accordingly, the undisputed facts show that prior to executing the March 6, 2020, Option: (a) Eric, in 2014, had directly told McLeod that the estimated budget could reach $10,000,000; and (b) Eric had informed Sugarman, in 2016, that financing was available up to $20,000,000. Meanwhile, the only budget document in existence estimated the budget around $13,000,000.

Thus, when McLeod signed the March 6, 2020, Option, which included the $125,000 cap, he either knew or should have known through his attorney that the budget was estimated at $10,000,000 to 20,000,000. That range was in in line with the only existing budget document. Accordingly, the facts do not support the claim that ZGM concealed or misrepresented information about the budget.

Similarly, McLeod has adduced no evidence that ZGM was aware of, let alone withheld or concealed, budget information before McLeod signed the September 24, 2020, ARSPA. Again, Eric testified he never received a budget for *Police Station* at any time. (Ex. 17 at 87.) And Mark stopped receiving budgets by no later than June 2020 (Ex. 20 at 109.) Thus, even though McLeod has discovered additional budget documents prepared in August 2020 and September 2020, he has adduced no evidence Eric or Mark ever saw those documents. Accordingly, McLeod cannot establish that Eric or Mark concealed or withheld these documents as a matter of law.

Similarly, McLeod has adduced no facts to support an articulable claim for damages based on fraud or concealment. McLeod boldly states that "the cap of $125,000 was many times less than [McLeod] was entitled to earn." (Ex. 9 at 10.) The undisputed facts reveal this assertion to be false.

It bears repeating: in the negotiations leading up to the March 6, 2020, Option, Sculptor sought to reduce the purchase price for *Police Station.* (Ex. 14 at 1; Ex. 12 at 40.) Only through the efforts of Sugarman, with support from ZGM,

did the purchase price remain unchanged. Thus, even though McLeod may believe he was entitled to a purchase price greater than $125,000, Sculptor was not willing to pay him more than $125,000 in March 2020, in September 2020 or at any other time.

In order to support a claim for damages "many times" greater than $125,000, McLeod would need to adduce evidence of a counterparty willing to pay him more. He has not. Thus, McLeod's damages claim is purely hypothetical because the facts show that the market price for *Police Station* was, in fact, $125,000, the exact amount McLeod was paid.

In sum, McLeod cannot state a *prima facie* case of fraud or concealment because the undisputed facts show that ZGM shared the budget and financing information it was aware of, and could not have shared budget information it was not aware of. Moreover, McLeod has adduced no evidence to support his theoretical claim to damages.

Therefore, Defendants respectfully request that the Court grants summary judgment in their favor on Plaintiff's Third Cause of Action. Alternatively, Mark Williams respectfully requests the Court grant summary judgment in his capacity as an individual Defendant on Plaintiff's Third Cause of Action.

### E.    The Principle of Quantum Meruit is Inapplicable as a Matter of Law

"Quantum meruit refers to the well-established principle that 'the law implies a promise to pay for services performed under circumstances disclosing that they

23

were not gratuitously rendered.'" (*E. J. Franks Constr., Inc. v. Sahota*, 226 Cal. App. 4th 1123, 1127-28 (2014)). The elements include: the plaintiff must have performed services pursuant to the defendant's express or implied request; (*Day v. Alta Bates Med. Ctr.*, 98 Cal. App. 4th 243, 248 (2002)); both parties must have understood that the plaintiff would be compensated for the services (*Huskinson & Brown v. Wolf*, 32 Cal. 4th 453, 458 (2004)); the services must have benefitted the defendant. (*Day v. Alta Bates Med. Ctr.*, 98 Cal. App. 4th 243, 249 (2002)).

McLeod claims, "The monies earned and otherwise obtained by Defendants, and each of them, from *Copshop* rightfully belong to Plaintiff under the doctrine of Quantum Meruit." (Ex. 9 at 17.) However, McLeod cannot state a *prima facie* case sounding in quantum meruit because the undisputed facts fail to satisfy the second element. Namely, both parties understood that McLeod might not be paid anything for writing *Police Station.*

Asked whether he was paid to write *Police Station*, Mr. McLeod responded: "I would rephrase it as I was paid $125,000 for the material. I wasn't paid for my service because I wasn't hired for an assignment." (Ex. 10 at 241.) In other words, because McLeod wrote *Police Station* on spec, he assumed risk that the screenplay might not sell, and he might earn nothing for it.

In sum, the undisputed facts show McLeod's claim for quantum meruit must fail as a matter of law. Accordingly, Defendants respectfully request that this Court grant summary judgment in Defendants' favor on Plaintiff's Fifth Cause of Action.

Alternatively, Mark Williams respectfully requests that this Court grant summary judgment in his favor, in his capacity as an individual Defendant.

## V.    Conclusion

For the foregoing reasons, Defendants, Mark Williams Films, LLC d/b/a Zero Gravity Management; Mark Williams; and, Eric Williams, respectfully request that this Court enter an Order granting summary judgment to Defendants. In the alternative, Defendant, Mark Williams, respectfully requests that this Court enter an Order granting summary judgment in his favor, in his capacity as an individual Defendant.


Dated:  October 19, 2023                    BARTA | TATE


                                            By: */s/ Robert M. Barta*
                                                Robert M. Barta
                                                Gregory T. Goldberg (*CACD Admission Pending*)
                                                Attorneys for Defendants,
                                                MARK WILLIAMS FILMS, LLC d/b/a
                                                ZERO GRAVITY MANAGEMENT,
                                                MARK WILLIAMS and ERIC
                                                WILLIAMS

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**